1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9   MICHAEL K. BROWN,                )        No. C 06-0264 WHA (PR)
                                     )
10              Petitioner,          )        **ORDER DENYING PETITION FOR**
                                     )        **WRIT OF HABEAS CORPUS;**
11    vs.                            )        **DENYING CERTIFICATE OF**
                                     )        **APPEALABILITY**
12                                   )
    TOM L. CAREY, Warden,           )
13                                   )
                Respondent.          )
14                                   )
    _____ )
15

16                            **INTRODUCTION**

17          Petitioner, a California prisoner proceeding pro se, filed a petition for a writ of habeas

18   corpus under 28 U.S.C. 2254.  On November 5, 2009, the case was reopened after petitioner

19   established that all claims were exhausted, and respondent was ordered to show cause why the

20   petition should not be granted based on petitioner's twenty-eight cognizable claims.  Respondent

21   filed an answer, and petitioner filed a traverse.  This order denies the petition.

22                            **STATEMENT**

23          Petitioner was tried for committing a series of robberies, attempted robberies, and

24   carjackings, in ten different incidents between September and October 2000, in Berkeley,

25   Oakland and San Leandro.  After the last of these, a carjacking on October 19, 2000, he was

26   identified at a show-up procedure and arrested.  The police interviewed him on October 19 and

27   again the next day, and he made a number of admissions connecting him to seven of the ten

28   incidents at issue.  Excerpts of these interviews were recorded and played for the jury, and

1

1    transcripts were admitted at trial at petitioner's request.

2          On November 1, 2000, the police held two six-men physical lineups that were attended

3    by the numerous eyewitnesses to the crimes charged.  At the lineup, each man in the lineups was

4    asked to put on a baseball style hat and the jacket petitioner was wearing when he was arrested.

5    The men in the first lineup were asked to say the following phrases: "I'm going to jump over this

6    counter; open the register, bitch; let me have your keys; put the keys in the ignition; stop crying;

7    don't make me hurt you; and let me see the palms of your hand."  The men in the second lineup

8    were asked to say the following phrases: "Yeah, what she said; give me the money; and don't

9    come around here."  In April 2002, two witnesses were shown store surveillance videotapes of

10   two of the robberies and still frame photographs taken from the videotapes.  Petitioner was

11   identified in the lineups and in court as the perpetrator of the charged offenses.

12         Petitioner had three different attorneys, but in March 2002, the trial court later granted

13   his motion to represent himself.  The trial was held in June and July 2002, about 20 months after

14   the incidents occurred.

15         In his defense, petitioner called his former counsel, Brian Bloom, who testified regarding

16   his observations at the pretrial lineups.  Petitioner also called Gerald Whitmore, Ph.D., a clinical

17   psychologist, who had met with petitioner a number of times in 1998 and on six occasions

18   between June and August 2000.  During the sessions in 2000, Whitmore referred petitioner to a

19   chemical dependency recovery program. The doctor had no contact with petitioner after August

20   9, 2000, and no knowledge of petitioner's mental state or his addiction between September 15

21   and November 16, 2000.

22         The jury found petitioner guilty of the following: (1) eight counts of robbery;

23   (2) three counts of attempted robbery; (3) two counts of carjacking; and (4) one count of

24   attempted escape from jail (Resp. Ex. C at 1).  The trial court also found true allegations that he

25   had suffered twelve prior felony convictions (*ibid.*).  Petitioner was sentenced to a total term of

26   eighty-seven years-to-life in state prison under California's Three Strikes Law (*ibid.*).

27         On August 23, 2004, the California Court of Appeal affirmed petitioner's conviction

28   (*ibid.*), and the California Supreme Court denied his request for review on October 27, 2004 (*id.*

1   Ex. F).  On January 17, 2006, petitioner filed the instant federal petition, but as it raised

2   numerous claims that had not been exhausted in the state courts, and for good cause shown, the

3   petition was stayed pending exhaustion of all his claims.  Petitioner filed a state habeas petition

4   raising the unexhausted claims, which was summarily denied by the California Court of Appeal,

5   and the California Supreme Court denied review.  The stay on the instant petition was thereafter

6   lifted.

7                                                      **ANALYSIS**

8   **A.   STANDARD OF REVIEW**

9          A district court may not grant a petition challenging a state conviction or sentence on the

10   basis of a claim that was reviewed on the merits in state court unless the state court's

11   adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

12   unreasonable application of, clearly established Federal law, as determined by the Supreme

13   Court of the United States; or (2) resulted in a decision that was based on an unreasonable

14   determination of the facts in light of the evidence presented in the State court proceeding."  28

15   U.S.C. 2254(d).  The first prong applies both to questions of law and to mixed questions of law

16   and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong

17   applies to decisions based on factual determinations, *Miller-El v. Cockrell*,  537 U.S. 322, 340

18   (2003).

19          Under 28 U.S.C. 2254(d)(2), a state court decision "based on a factual determination will

20   not be overturned on factual grounds unless objectively unreasonable in light of the evidence

21   presented in the state-court proceeding."  *Miller-El*, 537 U.S. 322 at 340; *see also Torres v.*

22   *Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

23          When there is no reasoned opinion from the highest state court to consider the

24   petitioner's claims, the federal court looks to the last reasoned opinion.  *See Ylst v. Nunnemaker*,

25   501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir. 2000).

26   In this case, the last reasoned opinion denying two of petitioner's claims, Claims 27 and 28, is

27   that of the California Court of Appeal on direct appeal (*see* Resp. Ex. C).  There is no reasoned

28   state court decision on the other claims, as they were summarily decided.  Consequently, they

will be analyzed based upon "an independent review of the record" to determine whether the state court's decision summarily denying them was an objectively unreasonable application of clearly established federal law. *See Plascencia v. Alameida*, 467 F.3d 1190, 1197-98 (9th Cir. 2006).

**B.   LEGAL CLAIMS**

Petitioner raised twenty-eight cognizable claims for federal habeas relief in his amended petition. The claims are most sensibly addressed in the following order, with the original enumeration shown in parentheses: 1) trial judge bias (claim 1); 2) admissibility of confessions into evidence (claims 2-4); 3) denial of right to confront witness (claim 5); 4) denial of good time credits during sentencing (claim 6); 5) denial of right to present evidence (claim 7); 6) failure to disclose impeachment evidence of a witness (claim 8); 7) ineffective assistance of counsel for failure to investigate (claim 9); 8) ineffective assistance of pre-trial counsel (claim 10); 9) ineffective assistance of appellate counsel (claim 11); 10) jury misconduct (claims 12 and 25); 11) improper use of peremptory challenges by prosecution (claim 13); 12) unconstitutionally suggestive lineup (claim 14); 13) false testimony by prosecution witness (claim 15); 14) jury not a fair cross section of the community (claim 16); 15) insufficient evidence to establish twelve priors (claims 17 and 22); 16) prosecution's failure to disclose *Brady* material (claim 18); 17) prosecutorial misconduct (claim 19); 18) denial of right to counsel prior to participation in a lineup (claim 20); 19) denial of right to free trial transcript as an indigent defendant (claim 21); 20) status rather than conduct used to impose criminal liability (claim 23); 21) denial of continuance (claims 24 and 26); 22) in-court identification of petitioner unconstitutionally suggestive (claim 27); and 23) denial of requests for funds to hire experts (claim 28).

**1.   Trial Judge Bias**

Petitioner claims that the trial judge was biased because the judge "denied mostly all the defense motions, showed favoritism to the prosecutor, denied several requests for transcripts and petitioner's request for a continuance" (Am. Pet. 23). Respondent contends that petitioner's claim "consists of nothing more than a mere disagreement with the court rulings," and is

1    "insufficient to support a claim of judicial bias" (Resp. Mem. P. & A. 9-10).

2        A claim of judicial misconduct by a state judge in the context of federal habeas review

3    does not simply require that the federal court determine whether the state judge committed

4    judicial misconduct; rather, the question is whether the state judge's behavior "rendered the trial

5    so fundamentally unfair as to violate federal due process under the United States Constitution."

6    *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995) (citations omitted).  A federal court must be

7    convinced that a particular influence, "under a realistic appraisal of psychological tendencies and

8    human weakness," poses "such a risk of actual bias or prejudgment that the practice must be

9    forbidden if the guarantee of due process is to be adequately implemented."  *Withrow v. Larkin*,

10   421 U.S. at 47.

11       Petitioner's claim that the trial court judge was biased is without merit because he

12   provides no evidence that there was "a risk of actual bias or prejudgment."  *Ibid.*  As respondent

13   states, it appears that petitioner is claiming that the judge was biased solely based on his

14   disagreement with the court's rulings.  However, bias can "almost never" be demonstrated solely

15   on the basis of a judicial ruling.  *Liteky v. United States*, 510 U.S. 540, 555 (1994).  Here,

16   petitioner fails to show that the trial judge was subject to any particular influence by which his

17   conduct could be called into question.  Without such evidence, petitioner's allegation is merely

18   conclusory.  Thus, petitioner's claim is without merit.

19           **2.     Admissibility of Confessions into Evidence**

20       Petitioner claims that his confessions made during the police interviews on October 19,

21   2000, and October 20, 2000, were not voluntary because they were obtained through

22   psychological coercion.  Moreover, petitioner argues that he did not waive his *Miranda* rights

23   knowingly and intelligently.  Thus, petitioner contends that his confessions should not have been

24   admitted into evidence because of their prejudicial effect.  Respondent argues that there was no

25   coercive police action, and that the interviews conducted by the officers were respectful and

26   short.

27       In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that certain

28   warnings must be given before a suspect's statement made during custodial interrogation can be

1  admitted in evidence. *Miranda* and its progeny govern the admissibility of statements made

2  during custodial interrogation in both state and federal courts. *Id.* at 443-45. Where a *Miranda*

3  waiver is concerned, the voluntariness prong and the knowing and intelligent prong are two

4  separate inquiries. *Derrick v. Peterson*, 924 F.2d 813, 820-24 (9th Cir. 1990). Once properly

5  advised of his rights, an accused may waive them voluntarily, knowingly and intelligently.

6  *Miranda*, 384 U.S. at 475. The distinction between a claim that a *Miranda* waiver was not

7  voluntary, and a claim that such waiver was not knowing and intelligent is important. *Cox v. Del*

8  *Papa*, 542 F.3d 669, 675 (9th Cir. 2008). The voluntariness component turns on the absence of

9  police overreaching, i.e., external factors, whereas the cognitive component depends upon the

10  defendant's mental capacity. *Ibid.*

11      To determine the voluntariness of a confession, the court must consider the effect that the

12  totality of the circumstances had upon the will of the defendant. *Schneckloth v. Bustamonte*, 412

13  U.S. 218, 226-27 (1973). "The test is whether, considering the totality of the circumstances, the

14  government obtained the statement by physical or psychological coercion or by improper

15  inducement so that the suspect's will was overborne." *United States v. Leon Guerrero*, 847 F.2d

16  1363, 1366 (9th Cir. 1988) (citing *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963)); *see*,

17  *e.g.*, *Cunningham v. Perez*, 345 F.3d 802, 810-11 (9th Cir. 2003) (officer did not undermine

18  plaintiff's free will where interrogation lasted for eight hours and officer did not refuse to give

19  break for food and water, officer suggested cooperation could lead to treatment rather than

20  prison, officer made statement he had put people in prison for similar conduct, officer denied

21  plaintiff's request to call therapist, and plaintiff diagnosed with mental disorder and taking bi-

22  polar medication).

23      According to the record, petitioner initialed a *Miranda* waiver form at the start of his

24  interview on October 19, 2000 (Reporter's Transcript ("RT") 173-174). Petitioner was also read

25  his *Miranda* rights by Officer Doug Calcagno at the start of his interview on October 20, 2000

26  (*id*. at 123), and indicated to Officer Calcagno that he understood his rights (*id*. at 125).

27  Petitioner does not contest that he waived his *Miranda* rights on either of these occasions.

28  Rather, he argues that he was coerced into waiving his rights, and thus, his waivers were not

1   voluntary.  Petitioner premises his argument on the grounds that he was tired during both

2   interviews, and because of his tiredness and the psychological coercion by the police, he waived

3   his *Miranda* rights involuntarily (Am. Pet. 23-24).

4        "The physical condition of a defendant at the time of his arrest is also an important factor

5   in determining whether his subsequent confession was voluntary."  *United States v. Mejia*, 559

6   F.3d. 1113, 1117 (9th Cir. 2009).  The record, however, does not support petitioner's contention

7   that he was tired at the time of the interviews.  Peter Lau, the officer who interviewed petitioner

8   on October 19, 2000, testified that petitioner did not look tired when the interview began (RT

9   184-186).  The interview lasted approximately one hour and ended when petitioner indicated that

10  he was tired (Clerk's Transcript ("CT") 434, 451).

11       The second interview on October 20, 2000, was even shorter than the first, lasting less

12  approximately 26 minutes, fourteen of which were recorded on tape (RT 140, 232).  When the

13  interviewing officer noticed petitioner looked sleepy, he ended the interview (*id*. at 132).  Then,

14  "approximately five minutes" after the second interview ended, "it was discovered that

15  [petitioner] had escaped the interview room through the ceiling" (*id.* at 133).

16       Under these circumstances, the trial court denied petitioner's pretrial motion to suppress

17  the confessions after determining petitioner's confessions were not coerced, involuntary or based

18  on any discriminatory effect (*id*. at 220, 232).  Here, nothing in the record supports petitioner's

19  position that the trial court arrived at a wrong conclusion.  On the contrary, based on the record

20  this Court finds that petitioner waived his *Miranda* rights voluntarily.

21       Petitioner also contends that he did not give his waiver knowingly and intelligently (Am.

22  Pet. 24).  The government has the burden to prove waiver by a preponderance of the evidence.

23  *Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986).  To satisfy its burden, the government must

24  introduce sufficient evidence to establish that under the totality of the circumstances, the

25  defendant was aware of "the nature of the right being abandoned and the consequences of the

26  decision to abandon it."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

27       In the October 19, 2000 interview, petitioner was read his *Miranda* rights, initialed a

28  *Miranda* rights waiver form, and stated that he understood his rights (RT 173-174).  In the

second interview the next day, petitioner was read his *Miranda* rights by Officer Calcagno (*id.* at

124).  Petitioner was also asked whether he understood his rights, to which he answered

affirmatively (*id*. at 125).  Furthermore, petitioner does not allege any language or

communication difficulties.  Essentially, petitioner contends that he was tired, and because of his

tiredness he was not able to understand the rights he was waiving (Am. Pet. 23-26).  However, as

discussed earlier, there is no evidence that petitioner appeared to be tired when either interview

began (RT 132, 184-86) officers ended the interviews when they noticed that petitioner appeared

tired (CT 451; RT 132), and five minutes after the conclusion of the second interview, petitioner

had enough energy to climb out of the interviewing room via the roof (RT 133).  Thus,

petitioner's argument that he was tired is belied by the record.  Without more, petitioner's

argument that he did not knowingly and intelligently waive his *Miranda* rights is not persuasive.

Even if the state court erred in its finding that petitioner's *Miranda* waivers were given

voluntarily, knowingly, and intelligently, the erroneous admission of a confession is subject to

harmless error analysis.  *Fulminante v. Arizona*, 499 U.S. 279, 306-12 (1991).  In other words,

habeas relief is appropriate only if the coerced confession had a "'substantial and injurious effect

or influence in determining the jury's verdict.'"  *Pope v. Zenon*, 69 F.3d 1018, 1025 (9th Cir.

1995) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  In the instant case, petitioner

was positively identified by multiple witnesses (*see* Resp. Ex. C at 12-13).  Thus, it cannot be

said that the admission of the statements made by petitioner had a substantial or injurious effect

on the verdict.  Accordingly, petitioner's claim is denied.

### 3.   **Confrontation Clause**

Petitioner claims that he was denied his rights to confrontation and to due process

because of the trial court's restrictions on cross-examination.  Respondent contends that the state

court's ruling was in accordance with state law and did not deny petitioner's rights to

confrontation or to due process.

During cross-examination, petitioner asked one of the prosecution witnesses if she had a

"PFN" number, which is a number assigned to someone who is arrested (RT 856).  The witness

stated that she did not know what a "PFN" number was (*ibid.*).  The prosecutor objected to the

1    relevancy of this line of questioning and the matter was taken outside the presence of the jury

2    (*id*. at 856-57).  Petitioner contended that the witness did have a "PFN" number and the fact that

3    she is saying she does not know what a "PFN" number is brought her credibility into question

4    (*id.* at 857-58).  The court explained to petitioner that you can only ask about a "PFN" number in

5    front of the jury if it is a qualified impeachment matter (*id*. at 858).  The prosecutor explained

6    that the witness was convicted of the misdemeanor crime of disturbing the peace, which is not a

7    qualifying impeachment matter because it is not a crime of moral turpitude (*id.* at 859).  The

8    court told petitioner that he could not bring up this issue in front of the jury (*ibid*.).

9          The Confrontation Clause of the Sixth Amendment provides that in criminal cases the

10   accused has the right to "be confronted with witnesses against him."  U.S. Const. amend. VI.

11   However, the Confrontation Clause does not prevent a trial judge from imposing reasonable

12   limits on cross-examination based on concerns of harassment, prejudice, confusion of issues,

13   witness safety or interrogation that is repetitive or only marginally relevant.  *Delaware v. Van*

14   *Arsdall*, 475 U.S. 673, 679 (1986).  The Confrontation Clause guarantees an opportunity for

15   effective cross-examination, not cross-examination that is effective in whatever way, and to

16   whatever extent, the defense might wish.  *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per

17   curiam).  A defendant meets his burden of showing a Confrontation Clause violation by showing

18   that "[a] reasonable jury might have received a significantly different impression of [a witness']

19   credibility . . . had counsel been permitted to pursue his proposed line of cross-examination."

20   *Van Arsdall*, 475 U.S. at 680.

21         California courts limit the use of prior convictions to impeach a witness' credibility to

22   those crimes that evidence moral turpitude.  *People v. Ewoldt*, 7 Cal. 4th 438, 442 (1994).  In

23   following this state law, the trial judge was avoiding confusing the issue of the witness's

24   credibility, which a crime of moral turpitude could affect, with the issue of whether the witness

25   had a criminal record.  Furthermore, petitioner has not shown that a reasonable jury would have

26   had a "significantly different impression" of the witness's credibility had he been permitted to

27   pursue the "PFN" line of questioning and the jury discovered that the witness had a relatively

28   innocuous misdemeanor conviction for disturbing the peace.  *See  Van Arsdall*, 475 U.S. at 680.

Thus, petitioner's rights to confrontation and to due process were not violated, and this claim is without merit.

### 4.     Good Time Credits

Petitioner contends that the trial court erred in denying him good time credits for his 700 actual days served.  In his traverse, petitioner reiterates that the trial court failed to give him the good time credits, and also raises a new argument that the trial court failed to give him credit for the 700 actual days he was in custody.

If a state prisoner's time credits have been improperly computed, he may have a claim for denial of due process. *Haygood v. Younger*, 769 F.2d 1350, 1355-58 (9th Cir. 1985) (en banc). In California, those convicted of violent crimes are entitled to a maximum of fifteen percent of their actual days served as good time credits.  *See* Cal. Pen. Code § 2933.1.  Petitioner was convicted of numerous offenses, including robbery (Cal. Pen. Code § 211/212.5(c)) (Am. Pet. Ex. A).  Robbery is a violent crime under California law, *see* Cal. Penal Code § 667.5, and thus, a person convicted of robbery is limited to earning good time credits at a rate of fifteen percent of their actual days in custody, *see* Cal. Penal Code § 2933.1.  The record shows that petitioner received 805 days of time credits, including 700 days of credits for the time he had served in custody prior to sentencing plus 105 days of good time credits (RT 1161; Am. Pet. Ex. A).  The 105 days of good-time credits is exactly fifteen percent of the 700 actual days petitioner served. Accordingly, petitioner received all the pre-sentence credits he is entitled to under state law. Thus his claim is without merit.

### 5.     Right to Present Evidence

Petitioner claims that "he was denied the right to present the following evidence: 1) money in his possession at the time of arrest ($400.00), 2) transcript of previous court proceedings, 3) surveillance multiplex video tapes, 4) notes from public defender at petitioner's physical lineup(s), 5) maintenance logs from the Oakland Police Department, [and], 6) a metal rod allegedly used to pick handcuffs" (Am. Pet. 28-29).  Petitioner asserts that it was a due process violation to exclude this evidence.  Respondent contends that petitioner did not seek to admit any of these items, and therefore, there were no rulings by the court to exclude any of the

1  evidence described above.

2          During trial, petitioner did not request that any of the described evidence be admitted at

3  trial.  Petitioner filed a motion to dismiss based on the fact that the money in his possession at

4  the time of arrest, which was $40 and not $400, was "missing" (RT 83).  The motion was denied,

5  and the prosecution later located the money and checked it into evidence (*id.* at 118).  As for the

6  transcripts of previous proceedings, petitioner fails to specify which transcripts.  A review of the

7  record demonstrates that petitioner requested a transcript of a June 17 hearing to show that the

8  trial court had promised him a continuance, but the trial court determined that the transcript was

9  not necessary because the court could not have granted the continuance if petitioner was in front

10  of a trial judge (*id.* at 65, 68.)  In any event, there is no indication that petitioner ever sought to

11  introduce this transcript into evidence at trial or that it had any relevance to the trial.

12          With regard to the surveillance video tapes from a multiplex, the trial court never

13  excluded from evidence, but rather denied petitioner's motion to fund his procurement of the

14  tapes (*id.* at 884-89.)  The court determined that money to copy the tapes would be denied

15  because the videos only "show who dropped that car off at Home Depot (in Emeryville)," and as

16  such does not "have anything to do with the actual carjacking" (*id.* at 890).  With regard to the

17  notes from the public defender, the trial court never excluded them from the trial.  Rather,

18  petitioner requested to subpoena the notes from the public defender, and the trial court told

19  petitioner that the subpoena was between him and his investigator and that the court was not

20  responsible for it (*id.* at 895-96).  Petitioner never located the notes, and thus never sought to

21  have them admitted.  Lastly, the maintenance logs and metal rod were also not located.

22  Petitioner fails to identify when in the state court proceedings he requested these two items be

23  admitted into evidence, and a review of the court transcript shows that he never did so.

24          Accordingly, petitioner's claim that the trial court violated his due process by denying

25  admission of the above-described evidence is without merit.

26          **6.        Failure to Disclose Impeachment Evidence of a Witness**

27          Petitioner claims that the prosecutor failed to disclose a witness's criminal history (Am.

28  Pet. at 30).  Because petitioner cites to "Claim Five" of his petition, he appears to be claiming

1    that the witness's misdemeanor conviction for disturbing the peace should have been disclosed

2    (*see* Am. Pet. at 27).

3         Respondent contends that petitioner's claim is without merit because there was no

4    suppression of material exculpatory evidence.  In *Brady v. Maryland*, 373 U.S. 83 (1963), the

5    Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused

6    upon request violates due process where the evidence is material either to guilt or to punishment,

7    irrespective of the good faith or bad faith of the prosecution."  *Id.* at 87.  The Supreme Court has

8    since made clear that the duty to disclose such evidence applies even when there has been no

9    request by the accused, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and that the duty

10   encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*,

11   473 U.S. 667, 676 (1985).  "There are three components of a true *Brady* violation: [t]he evidence

12   at issue must be favorable to the accused, either because it is exculpatory, or because it is

13   impeaching; that evidence must have been suppressed by the State, either willfully or

14   inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281-82

15   (1999).  "[T]here is never a real '*Brady* violation' unless the nondisclosure was so serious that

16   there is a reasonable probability that the suppressed evidence would have produced a different

17   verdict."  *Id.* at 281.

18        Petitioner's claim that the prosecutor failed to disclose a witness' criminal history is

19   without merit.  Petitioner fails to show any of the prongs from *Strickler*.  The trial court judge

20   refused to allow petitioner to question the witness about her "PFN" number because the witness'

21   crime did not qualify as impeachment evidence under California law (RT 856).  As discussed

22   earlier in petitioner's confrontation clause claim, disturbing the peace is not a crime of moral

23   turpitude and therefore is not admissible as impeachment evidence.  Furthermore, the prosecutor

24   did not suppress any evidence as petitioner had the same access to the witness' criminal history

25   as the prosecutor.  Lastly, petitioner has failed to show prejudice.  Multiple witnesses identified

26   petitioner as the culprit (*see* RT, 338-39, 352-53, 417-418), and it is unlikely that one of those

27   witness's having a relatively minor misdemeanor for disturbing the peace would have produced a

28   different verdict.  Accordingly, the prosecution did not suppress material exculpatory evidence in

1    violation of *Brady*.  Petitioner's claim is without merit.

2         **7.    Ineffective Assistance of Investigator**

3         Petitioner claims that "on several occasions I requested my investigator interview

4    prosecution witnesses, research cases, case citing, and gather discovery, only to be frustrated and

5    discouraged by his inconsistencies"  (Am. Pet. 30).  Respondent contends that there is no

6    Supreme Court authority clearly establishing a right to effective assistance of an investigator,

7    and furthermore, petitioner has demonstrated no prejudice from the alleged deficiencies of the

8    investigator.

9         The Ninth Circuit has held that "'the effective assistance of counsel guarantee of the Due

10   Process Clause requires, when necessary, the allowance of investigation expenses or

11   appointment of investigative assistance for indigent defendants in order to insure effective

12   preparation of their defense by their attorneys.'"  *Williams v. Stewart*, 441 F.3d 1030, 1053 (9th

13   Cir. 2006) (*quoting Mason v. Arizona*, 504 F.2d 1345, 1351 (9th Cir. 1974).  However, there is

14   no Supreme Court authority establishing or recognizing a constitutional right to effective

15   assistance from an investigator, as required by 28 U.S.C. 2254(d).  *Thompson v. Lewis*, 2003 WL

16   715900, (N.D. Cal. 2003) (holding that the right to effective assistance of counsel did not include

17   the right to effective assistance from an investigator during self-representation).  Consequently,

18   petitioner is not entitled to federal habeas relief on this claim.

19        **8.    Ineffective Assistance of Pre-Trial Counsel**

20        Petitioner contends that the three attorneys he had prior to trial provided ineffective

21   assistance, in violation of his Sixth Amendment rights (Am. Pet. 33-34).  Petitioner claims that

22   his assigned attorneys failed to act professionally, conduct research, consult with experts, and

23   challenge the grand jury selection.  Respondent contends that petitioner is not entitled to raise an

24   ineffective assistance of counsel claim because he chose to represent himself.  Respondent also

25   argues that petitioner's claim fails on the merits because petitioner makes conclusory allegations.

26        Respondent is correct insofar as that a "defendant who elects to represent himself cannot

27   thereafter complain that the quality of his own defense amounted to a denial of 'effective

28   assistance of counsel.'"  *See Savage v. Estelle*, 924 F.2d 1459, 1466 (9th Cir. 1990) (quoting

13

1   *Faretta v. California*, 422 U.S. 806, 834-35 n.46 (1975)).  However, a defendant who elects to

2   represent himself may be able to assert an ineffective assistance claim against counsel who

3   represented him earlier in the proceedings if he can show deficient performance and prejudice

4   under the *Strickland* test.  *See Cook v. Schriro*, 538 F.3d 1000, 1015-16 (9th Cir. 2008).  Thus,

5   petitioner is not barred from raising an ineffective assistance of counsel claim.

6          A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth

7   Amendment right to counsel, which guarantees not only assistance, but effective assistance of

8   counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The benchmark for judging any

9   claim of ineffectiveness must be whether counsel's conduct so undermined the proper

10  functioning of the adversarial process that the trial cannot be relied upon as having produced a

11  just result.  *Ibid*.  In order to prevail on a Sixth Amendment ineffectiveness of counsel claim,

12  petitioner must establish two things.  First, he must establish that counsel's performance was

13  deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing

14  professional norms.  *Id.* at 687-88.  Second, he must establish that he was prejudiced by

15  counsel's deficient performance, i.e., that "there is a reasonable probability that, but for

16  counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at

17  694.

18         Petitioner has the burden of showing that his assigned attorneys rendered deficient

19  performance, and that their deficiency resulted in actual prejudice.  In the instant case, petitioner

20  claims generally that his counsel failed to act professionally, conduct research, consult with

21  experts, and challenge the grand jury selection (Am. Pet. 34).  Petitioner does not identify any

22  specific counsel should have done, research they should have conducted, experts they should

23  have consulted, or grand jury challenges they should have brought.  Nor does he explain how

24  doing so would have made a difference in the outcome of his trial.  As a result, his allegations of

25  ineffectiveness are simply conclusory, and "[c]onclusory allegations which are not supported by

26  a statement of specific facts do not warrant habeas relief."  *See James v. Borg*, 24 F.3d 20, 26

27  (9th Cir. 1994).  Without more, petitioner's claim that his attorneys provided ineffective

28  assistance is conclusory.  Accordingly, this claim is without merit.

1

### 9. <u>Ineffective Assistance of Appellate Counsel</u>

Petitioner contends that his appellate counsel, Susan D. Shors, provided deficient performance and violated his right to effective assistance of counsel because she refused to raise several of his claims on appeal and encouraged him to drop his appeal (Am. Pet. 35-36). Petitioner wanted to raise seventeen issues on direct appeal, but his appellate counsel only raised two (*id.* at 35).

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. *Evitts v. Lucey*, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in *Strickland*. First, the petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Second, the petitioner must show prejudice, which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal. *Id.* at 285-86.

Counsel has a constitutionally-imposed duty to consult with a criminal defendant client about an appeal when there is reason to think that a rational defendant would want to appeal or that this particular defendant reasonably demonstrated to counsel that he was interested in appealing. *Roe v. Flores-Ortega*, 528 U.S. 470, 480 (2000). It is important to note that appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989). Appellate counsel therefore will frequently remain above an objective standard of competence and have caused his client no prejudice for the same reason--because he declined to raise a weak issue. *Ibid.*

Here, appellate counsel consulted with petitioner, discussed the possible appellate claims, weeded out the weaker claims, and identified the ones that she believed were tenable (Am. Pet.

13).  She had no duty to raise claims, even non-frivolous ones, that she felt were weak or unlikely to succeed.  See *Jones*, 463 U.S. at 751-54.  In the absence of any showing that any particular decision by counsel was unreasonable, there is no deficient performance.  In addition, what petitioner characterizes as counsel encouraging him to drop his appeal was actually her warning him that the appeal involved a risk that the state court might correct a sentencing error to petitioner's disadvantage (Am. Pet. 13).  Petitioner does not show that counsel was incorrect, let alone unreasonable, about her assessment of this risk or that the issues he wanted to raise on appeal were weak.  Simply advising petitioner of the risks of pursuing an appeal does not constitute deficient performance.  Because counsel was not deficient, there is no need to analyze *Strickland's* prejudice prong.  Accordingly, petitioner's claim is without merit and is denied.

### 10.  <u>Jury Misconduct</u>

Petitioner claims that jury misconduct occurred at trial because one prospective member of the jury, who was not part of the actual jury, claimed during voir dire to know petitioner (Am. Pet. 37).  Petitioner argues that the prospective juror could have biased the actual members of the jury, and the trial judge should have investigated whether that was the case and should have given petitioner declarations from the jury, or access to the jury, so that he could verify whether any members of the jury were biased toward him (*id.* at 38-39, 60-61).  Based on the record, this appears to be an argument that the trial court should have instructed the jury, pursuant to CALJIC No. 17.60, that they could discuss the case with petitioner and the trial lawyers following discharge (*see* RT 1138-55).  Petitioner, apparently in order to establish that the jury was biased, also complains that the jury found him guilty of one of the robberies even though one of the witnesses testified that petitioner was not the robber (*id.* at 39).

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors.  U.S. Const. amend. VI.  "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury."  *Tinsley v. Borg*, 895 F.2d 520, 523-24 (9th Cir. 1990) (internal quotations omitted).  The Ninth Circuit has recognized that to disqualify a juror for cause requires a showing of actual bias or implied bias, that is "bias in fact, or bias conclusively presumed as a matter of law."  *United States v. Gonzalez*, 214 F.3d

1109, 1111-12 (9th Cir. 2000). However, the Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. *Ibid*. Petitioner claims that there was jury misconduct but he does not substantiate the claim with any facts. The possibility that the jurors might have talked to the prospective juror who knew petitioner is not enough to show prejudice. Without more, petitioner's argument that a prospective juror who knew him resulted in prejudice from other members of the jury is unpersuasive.

Petitioner's claim that the jury must have been prejudiced because they convicted him despite one witness failing to identify him as her robber is also unpersuasive because petitioner was positively identified by other witnesses whom the jury could have believed (*see* Resp. Ex. C at 2-13). Petitioner's claim that the jury should have received an instruction under CALJIC No. 17.60 that the jury may talk to the defendant or counsel after discharge does not merit federal habeas relief because there is no federal law requiring such an instruction. Accordingly, petitioner's claim is without merit and is denied.

## 11.   Equal Protection – Jury Selection

Petitioner claims that the prosecutor intentionally used her peremptory challenges to "discriminate and exclude qualified black jurors" (Am. Pet. 40).

The Equal Protection Clause forbids the challenging of potential jurors solely on account of their race. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). Petitioner's claim that the prosecutor violated the Equal Protection Clause by excluding qualified black jurors on the basis of race is without merit. Petitioner may not raise a *Batson* claim in federal habeas if he failed to object to the prosecution's use of peremptory challenges at trial. *Haney v. Adams*, 641 F.3d 1168, 1169, 1173 (9th Cir. 2011) (joining sister circuits in concluding that denial of *Batson* claim by state court was not contrary to federal law under AEDPA where defendant failed to make timely objection at trial). A review of the state court record shows that there were no defense objections to the prosecutor's peremptory challenges, and there were no claims of *Batson* error. (CT at

1   516-17.)  Thus, petitioner's claim must be denied.

2       **12.    Unconstitutionally Suggestive Lineups**

3       Petitioner claims that one of the two lineups was unconstitutionally suggestive because

4   Officer Short removed a lineup "filler" who looked similar to petitioner, and replaced him with a

5   filler who did not (Am. Pet. 42).  On November 1, 2000, Officer Short conducted two lineups

6   (Augmented RT ("Aug RT") 3).  Officer Short decided to remove a person from the first lineup

7   because he looked too much like petitioner (*ibid*.).  However, Officer Short later included that

8   person in the second lineup because two people from the first lineup got sick and had to be

9   removed, and that person was one of the only people left who met the criteria (*ibid.*).  Petitioner

10  filed a motion to suppress evidence from the lineup, which the trial court denied after finding

11  that Officer Short's actions did not make the lineup unduly suggestive (*id.* at 43).

12      "A conviction which rests on a mistaken identification is a gross miscarriage of justice."

13  *Stovall v. Denno*, 388 U.S. 293, 297 (1967).  Procedures by which the defendant is identified as

14  the perpetrator therefore must be examined to assess whether they are unduly suggestive.  "It is

15  the likelihood of misidentification which violates a defendant's right to due process."  *Neil v.*

16  *Biggers*, 409 U.S. 188, 198 (1972).  Due process protects against the admission of evidence

17  deriving from suggestive pretrial identification procedures.  *Id.* at 196.  To prevail on habeas

18  review, a petitioner must show that the identification procedures used in the case were "'so

19  unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied

20  due process of law.'"  *Johnson*, 63 F.3d at 929 (quoting *Stovall*, 388 U.S. at 301-02) (finding no

21  due process violation where any possible prejudice defendant may suffer from unreliable

22  identification mitigated by cross-examination and other courtroom safeguards).

23      Petitioner's claim that Officer Short replaced a filler who closely resembled him in the

24  line up with one who did not is not "conducive to irreparable mistaken identification."  *See ibid.*

25  There were six men of the same race and general build as petitioner in each of the lineups (Aug

26  RT 36).  Replacing someone who looked too much like petitioner would only decrease the

27  chance of misidentification and would not render the lineup unduly suggestive as long as there

28  were others with petitioner's general characteristics, as there were in this case (*id.* at 4).

1    Furthermore, the person who was removed was eventually used in the second lineup (*ibid.*).

2    Under these circumstances, petitioner's claim that Officer Short made the lineup

3    unconstitutionally suggestive is without merit.

4         **13.    False Testimony by Prosecution Witnesses**

5         Petitioner claims generally that multiple witnesses for the prosecution gave false

6    testimony in court (Am. Pet. 43-45), although only two such instances can be discerned from his

7    papers.  First, petitioner appears to argue that Officer Calcagno gave false testimony regarding

8    petitioner's escape attempt after the interview on October 20, 2000 (*id.* at 44).  Second,

9    petitioner claims that because Linda Lucas, a witness to one of the robberies, was incorrect in her

10   claim that she identified him in a police line-up (*id.* at 45).  Respondent argues that petitioner's

11   claim regarding Officer Calcagno's testimony is "sheer speculation" and that Ms. Lucas'

12   incorrect recollection of events does not amount to perjury (Resp. M.P.A. 21).  Respondent also

13   argues that because the jury was fully aware of Lucas's incorrect testimony, petitioner is not

14   entitled to relief (*id.* at 21-22).

15        "[A] conviction obtained by the knowing use of perjured testimony is fundamentally

16   unfair, and must be set aside if there is any reasonable likelihood that the false testimony could

17   have affected the judgment of the jury."  *United States v. Agurs*, 427 U.S. 97, 103 (1976).  So

18   must a conviction obtained by the presentation of false evidence.  *See United States v. Bagley*,

19   473 U.S. 667, 678-80 (1985).  Ultimately, relief will depend on whether with the perjured

20   testimony or false evidence petitioner received a fair trial.  *See Kyles v. Whitley*, 514 U.S. 419,

21   434 (1995).

22        Petitioner does not provide any specific facts demonstrating that Officer Calcagno's

23   testimony was perjured.  Petitioner's own differing account does not establish on its own that

24   Calcagno's testimony was false, much less that it was  lied, much less that the prosecutor knew

25   that Calcagno lied.  As to petitioner's claim that Ms. Lucas committed perjury by incorrectly

26   stating that she had identified him in a line-up (Am. Pet. at 43-45), respondent is correct that,

27   without more, a witness's "inaccurate recollection is not a basis for perjury" (Resp. M.P.A. 32).

28   Petitioner challenges respondent's contention by asserting that respondent "cannot produce any

1   case law to back up" his argument (Trav. 18).  However, petitioner himself provides the legal

2   authority when he states that "[p]erjury requires willful intent to provide false testimony, rather

3   than confusion, mistake, or faulty memory" (*id.* at 19 (citing *United States v. Fawley*, 137 F.3d

4   458, 463 (7th Cir. 1998)).  *See also United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (holding

5   that perjury requires "false testimony concerning a material matter with the willful intent to

6   provide false testimony, rather than as a result of confusion, mistake, or faulty memory").  While

7   Lucas's testimony was inaccurate, petitioner does not allege any facts that indicate that she had a

8   "willful intent" to lie.  Furthermore, the prosecutor informed the jury that Lucas's testimony was

9   inaccurate, thus preventing her testimony from carrying any weight or otherwise rendering the

10   trial fundamentally unfair (RT 993).  Accordingly, petitioner's claim for relief is without merit.

11       **14.    Composition of Jury**

12       Petitioner claims that the jury did not represent a fair cross-section of the community

13   because he alleges at least 50% of his community consists of African-Americans, and only two

14   were seated as jurors (Am. Pet. 46).

15       A criminal defendant has a constitutional right stemming from the Sixth Amendment to a

16   fair and impartial jury pool composed of a cross section of the community.  *See Holland v.*

17   *Illinois*, 493 U.S. 474, 476 (1990).  The fair cross section requirement applies only to the larger

18   jury pool or venire and is not applicable to petit juries.  *Lockhart v. McCree*, 476 U.S. 162, 173-

19   74 (1986).  So although the Sixth Amendment guarantees that the petit jury will be selected from

20   a pool of names representing a cross section of the community, it does not require that petit

21   juries actually chosen must mirror the community and reflect the various distinctive groups in

22   the population.  *See Taylor*, 419 U.S. at 538.  In *Duren v. Missouri*, 439 U.S. 357 (1979), the

23   Supreme Court held that to establish a *prima facie* violation of the fair cross-section requirement,

24   a defendant must show that "(1) the group alleged to be excluded is a 'distinctive' group in the

25   community; (2) that the representation of this group in venires from which juries are selected is

26   not fair and reasonable in relation to the number of such persons in the community; and (3) that

27   this under-representation is due to systematic exclusion of the group in the jury-selection

28   process."  *Id.* at 364.

1    Petitioner's claim is without merit because he fails to establish the second and third

2    prongs of the *Duren* test.  Petitioner satisfies the first prong because African-Americans are a

3    distinct groups.  *See United States v. Cannady*, 54 F.3d 544, 547 (9th Cir. 1995).  However,

4    petitioner fails to provide any evidence that the representation of African-Americans in the jury

5    venire was not fair and reasonable in relation to the number of people in the community.  In fact,

6    petitioner only complains about the seated jurors, not the jury venire.  There is no guarantee that

7    the seated jury must mirror the community and reflect the various distinctive groups in the

8    population.  *Taylor*, 419 U.S. at 538.  Thus, petitioner fails to meet the second prong of *Duren*.

9    Petitioner also fails to satisfy the third prong because he does not provide any evidence that any

10   alleged under-representation was the result of the "systematic exclusion" of African-Americans

11   from the jury selection process.  Accordingly, petitioner's claim is without merit.

12        **15.    Insufficient Evidence to Establish Twelve Prior Convictions**

13        Petitioner claims that the trial court erred in finding there was sufficient evidence to

14   prove twelve prior serious felonies because they were not brought or tried separately as required

15   by California law (Am. Pet. 47).  Moreover, petitioner contends that the trial court erred in

16   failing to let a jury determine whether the charges were brought and tried separately (*ibid.*).[1]

17   Respondent claims that there is no federal constitutional right to have a jury determine the

18   validity of prior convictions, and that petitioner specifically waived his right to a jury trial on the

19   priors.  (Resp. M.P.A. 23).

20        A person in custody pursuant to the judgment of a state court can obtain a federal writ of

21   habeas corpus only on the ground that he is in custody in violation of the Constitution or laws or

22   treaties of the United States.  28 U.S.C. 2254(a).  In other words, "it is only noncompliance with

23   *federal* law, not state law, that renders a State's criminal judgment susceptible to collateral attack

24   in the federal courts."  *Wilson v. Corcoran*, 131 S. Ct. 13, 16 (2010) (emphasis in original).

25   Petitioner's claim that state law required the prior convictions to have been brought and tried

26   separately does not set forth a proper basis for federal habeas relief because it alleges the

27

28        [1]Petitioner raises these issues in Claims Seventeen and Twenty-Two in the amended petition, and they are consolidated and addressed here together.

violation of state law.  *See Swarthout v. Cooke*, 131 S. Ct. 859, 861-62 (2011) (holding that federal habeas writ is unavailable for violations of state law or for alleged error in the interpretation or application of state law).

Petitioner also does not have a federal constitutional right to a jury determination on the fact that he had twelve prior convictions.  *See Apprendi v. New Jersey*, 530 U.S. 466, 488-90 (2000) (specifically exempting from requiring a jury determination "fact of prior conviction").  Even if, as petitioner contends, California law gives petitioner a right to have the jury determine that he suffered twelve prior convictions, or that they arose from separate proceedings, federal law does not confer such a right.  Accordingly, petitioner's claim is denied.

### 16.    Failure to Disclose *Brady* Material

Petitioner claims that the prosecutor failed to disclose "'*Brady*' material," namely the evidence discussed above about the money found on petitioner when he was arrested.  Petitioner also claims that the prosecution did not disclose a witness's misdemeanor conviction for disturbing the peace, but that claim was discussed and rejected above (*supra* at 18-19).

Petitioner claims that the prosecutor failed to disclose that $400 found on petitioner when he was arrested went missing.  The record shows that $40.83 was found on petitioner was checked into evidence (RT 118), and there is no other indication that there was any more money involved.  Furthermore, petitioner does not provide any reason for why the money would be material or exculpatory to any issue at trial.  Even if the alleged missing money was disclosed, it would not have undermined confidence in the outcome of the trial.  *See Bagley*, 473 U.S. at 682.  Thus, petitioner's Brady claim concerning the prosecution's failure to disclose the money and the witness' criminal history is without merit.

### 17.    Prosecutorial Misconduct

Petitioner claims that the prosecution "conducted improper questioning, suppressed discovery beneficial to petitioner, stated personal opinion" about the credibility of witnesses, and prejudiced the jury by telling them that the appellate court would rectify any errors (Am. Pet. 49).  Respondent contends that petitioner's arguments are specious, and that "[t]here is nothing improper about the prosecutor's imprecise opening remarks concerning what she anticipated the

1    evidence to show" (Resp. M. P.A. 25-26).

2         Prosecutorial misconduct is cognizable in federal habeas corpus.  The appropriate

3    standard of review is the narrow one of due process and not the broad exercise of supervisory

4    power.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A defendant's due process rights are

5    violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  *Ibid.*  The first

6    issue is whether the prosecutor's remarks were improper; if so, the next question is whether such

7    conduct infected the trial with unfairness.  *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).

8         Petitioner does not identify any specific instances in which the prosecutor conducted

9    improper questioning, without which this portion of his claim fails.  Similarly, petitioner does

10   not specify what discovery the prosecution suppressed.  To the extent he relies upon his *Brady*

11   claims, those claims have been rejected for the reasons discussed above.  Petitioner is correct

12   that the prosecutor told the jury not to worry about legal issues because they are reviewed by

13   appellate courts (RT 1062).  He cites no authority that such a statement is improper, and even if

14   it were, it would not have caused prejudice because the jury does not make legal determinations.

15        Petitioner's last claim, that the prosecutor improperly certified the credibility of her

16   witnesses (*id*. at 1065), requires further analysis.  A prosecutor may not vouch for the credibility

17   of a witness.  *United States v. Lopez*, 803 F.2d 969, 973 (9th Cir. 1986).  Improper vouching for

18   the credibility of a witness occurs when the prosecutor places the prestige of the government

19   behind the witness or suggests that information not presented to the jury supports the witness's

20   testimony.  *United States v. Young*, 470 U.S. 1, 7 n.3, 11-12 (1985).  Here, the prosecutor asked

21   in her opening statement whether six cops would risk their careers by framing petitioner for

22   crimes he did not commit, and whether sixteen or so civilians would take time out of their day to

23   frame petitioner (RT 1065).  These remarks amount to asking the jurors to consider whether it

24   was likely that all the witnesses were lying, they do not endorse the truth of their testimony or

25   their credibility generally, and as such they do not place the prestige of the government behind

26   the witnesses.  Consequently, the cited remarks by the prosecutor do not constitute improper

27   vouching.  Petitioner's claim is without merit.

28        **18.**    **Right to Counsel at Lineup**

Petitioner claims that he was denied the opportunity to speak with his counsel at the pre-indictment lineups on November 1, 2000 (Am. Pet. 50).  A defendant has a right to counsel at a post-indictment lineup because it is a critical stage of the prosecution.  *United States v. Wade*, 388 U.S. 218, 236-37 (1967).  However, counsel is not required at pre-indictment lineups because the right to counsel does not attach until adversary judicial proceedings have been initiated against a defendant.  *Kirby v. Illinois*, 406 U.S. 682, 688-91 (1972); *cf. People v. Bustamante*, 30 Cal. 3d 88, 99 (1981) (no right to counsel at pre-indictment lineup under California law).  Consequently, petitioner's was not entitled to speak with his counsel during his pre-indictment lineups under federal law.

## 19.    Right to Free Trial Transcript

Petitioner claims that he was denied free copies of two trial transcripts, specifically for an in-camera hearing on June 17, 2002, and a court proceeding on April 12, 2002 (Am. Pet. 53-54).  Respondent contends that petitioner did in fact have access to these transcripts for his appeal.

Although there is no due process requirement that states allow direct appeals of criminal convictions, if state law does permit such appeals, due process and equal protection require that indigent criminal defendants be provided with free transcripts for use in the appeal, or other effective means of obtaining adequate appellate review.  *Britt v. North Carolina*, 404 U.S. 226, 227 (1971); *Griffin v. Illinois*, 351 U.S. 12, 18-20 (1956) (per curiam).  A court need only provide an indigent defendant with "a record of sufficient completeness" to prepare an appeal; irrelevant or extraneous portions of the transcript may be omitted.  *Mayer v. City of Chicago*, 404 U.S. 189, 194-95 (1971).  Two criteria are relevant in determining the need for the missing record:  (1) the value of the transcript to the defendant; and (2) the availability of alternative devices which would fulfill the same function.  *Madera v. Risley*, 885 F.2d 646, 648 (9th Cir. 1989).  A habeas petitioner also must establish prejudice from the lack of the record to be entitled to habeas corpus relief.  *Id.* at 649.

Petitioner's claim is without merit.  A review of the record shows that on June 17, 2002, petitioner made a motion for funding for an expert witness and requested that the court hear the motion in-camera (CT 384-88).  The minute order for that day indicates that the trial court heard

the motion in-camera and denied petitioner's motion without prejudice (*id.* at 389), and

petitioner made the same request to the trial judge (*see* RT  96).  It is evident that petitioner had a

sufficient record to appeal the denial of the motion, as it was reflected in the Clerk's Transcript

to which he had access; indeed, he challenges the denial of the motion in the instant case (*see*

Am. Pet. 66).  Petitioner claims the transcript would show "bias," but he does not allege how it

would have established bias or whose bias it would have shown (Am. Pet. at 53).  Consequently,

petitioner has not failed to adequately allege that he was prejudiced from any inability to access

the June 17, 2002 transcript.

With regard to the April 12, 2002 transcript, petitioner claims that it shows he was

promised a continuance and then denied one (Am. Pet. 54).  The record demonstrates that

petitioner did have this transcript.  It is part of the appellate record and is actually referenced by

petitioner's petition in "claim 24" (*see* Am. Pet. 58 (citing RT 3/20/02, 3/27/02, 4/12/02,

5/14/02, 6/17/02 ("RT II")).  Accordingly, petitioner's claim is without merit.

### 20.    **"Status" Rather than "Conduct" Used to Impose Criminal Liability**

Petitioner claims, without proper explanation, that his "status" of being a drug addict was

used to find him guilty rather than his "conduct" of actually committing a crime (Am. Pet. 56).

It is not completely clear what petitioner means by this, but presumably he is referring to his

"status" of voluntary intoxication which comports with his later discussion about raising a

diminished capacity or insanity defense.  Petitioner also claims that he was unaware of the

possibility of a diminished capacity defense, and he claims his prior attorneys did not inform him

of such a defense, and thus he failed to ask for the relevant jury instructions (*ibid.*).  Petitioner

appears to claim that his prior attorneys provided ineffective counsel by failing to advise him of

the possibility of raising a diminished capacity or insanity defense (*ibid.*).

Petitioner cannot complain about his own lack of effectiveness as a lawyer because a

"defendant who elects to represent himself cannot thereafter complain that the quality of his own

defense amounted to a denial of 'effective assistance of counsel.'"  *Savage*, 924 F.2d at 1466

(further citations omitted).  Prior counsel's failure to inform him of a diminished capacity

defense was appropriate because California abolished such a defense in 1981.  *See* Cal. Penal

Code §§ 22, 28.  Accordingly, petitioner's claim for relief is denied.

### 21.    Continuance

Petitioner contends that the trial court violated his due process rights and abused its discretion when it failed to grant him a continuance (Am. Pet. 57-60).[2]  Petitioner argues that the he needed a continuance to have adequate time to prepare for trial, and to consult with his doctor.  Respondent contends that the trial court did not err in denying the motion because petitioner raised no objection to proceeding with the trial until June 17, 2002, the day his trial was scheduled to begin, and because petitioner had sufficient time to prepare for trial.

To establish a constitutional violation based on the denial of a continuance motion, a petitioner must show that the trial court abused its discretion through an "unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." *Houston v. Schomig*, 533 F.3d 1076, 1079 (9th Cir. 2008).  In addition, the improper denial of a requested continuance warrants habeas relief only if there is a showing of actual prejudice to petitioner's defense resulting from the trial court's refusal to grant a continuance.  *Gallego v. McDaniel*, 124 F.3d 1065, 1072 (9th Cir. 1997).  In considering whether the denial of a continuance implicating a defendant's Sixth Amendment right to counsel is an abuse of discretion, the Ninth Circuit has applied the factors set forth in *United States v. Robinson*, 967 F.2d 287, 291 (9th Cir. 1992): (1) whether the continuance would inconvenience witnesses, the court, counsel, or the parties; (2) whether other continuances have been granted; (3) whether legitimate reasons exist for the delay; (4) whether the delay is the defendant's fault; and (5) whether a denial would prejudice the defendant.  *See United States v. Mejia*, 69 F.3d 309, 314 (9th Cir. 1995).  But the ultimate test remains whether trial court abused its discretion through an "unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." *Houston*, 533 F.3d at 1079 (quoting *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983)) (internal quotation marks omitted).

Petitioner's trial was set more than one year after the charges were initially levied against him.  The trial court asked him specifically on March 27, 2002, whether he would be ready for trial by June 2002, and he indicated that he would be (RT II at 7).  Petitioner was advised

---

[2]Petitioner raises this issue in Claims 24 and 26, and thus both claims are addressed jointly.

1    multiple times that his trial would be in June 2002, and he was advised that he should request

2    more time if he needed it, but he did not until the first day of trial (*see id.* at 7, 15, 20; Reporter's

3    Transcript 6/17/02 ("RT III") at 23-24).  Granting a last-minute continuance would have

4    inconvenienced the witnesses and the court (*see* RT III 23).  Petitioner claims he was prejudiced

5    because he lacked time to consult with a doctor, but he does not explain why he needed more

6    time to do so.  Nor does petitioner provide a persuasive justification for why he waited until the

7    eve of trial to ask for a continuance.  Based on these facts, the trial court did not err in denying

8    the continuance, and petitioner's claim is without merit.

9            **22.    In-Court Identification of Petitioner**

10           Petitioner contends that the in-court identification of him was unduly suggestive because

11   he was the only person at the defense table (Am. Pet. 64).  Respondent asserts that the California

12   Court of Appeal was correct in finding that petitioner had waived the claim, and that the claim

13   fails on the merits in any event (*see* Resp. Ex. C at 13-17).  Petitioner contends that he did not

14   waive the claim because he objected each time he was identified in court (Traverse 34-36).

15           On direct appeal, the California Court of Appeal determined that petitioner's claims had

16   "been waived by his failure to assert them at trial" (Resp. Ex. C at 14).  Nevertheless, the state

17   appellate court also rejected petitioner's claim on the merits:

18           In any event, the singling out of [Petitioner] in the courtroom for "possible
        identification, without more, is not a process which requires reversal." (United
19      States v. Domina (9th Cir.1986) 784 F.2d 1361, 1370-1371; see People v.
        Breckenridge (1975) 52 Cal.App.3d 913, 936.) Relying upon isolated portions of
20      witnesses' testimony, [Petitioner] argues that "[s]ome witnesses who were
        uncertain about identifying [Petitioner] before trial were suddenly able to do so in
21      the courtroom, where [Petitioner] sat alone at the defense table. Others who had
        equal opportunity to view the robber did not identify [Petitioner] in court."
22      However, that some of the witnesses expressed uncertainty of their identification
        before trial did not preclude them from making in-court identifications. (See
23      People v. Dominick (1986) 182 Cal.App.3d 1174, 1197.) Such a circumstance
        does "not amount to an impermissibly unfair one person show-up. [Citation.]"
24      (Ibid.) Rather, "an identification made in front of the jury carries with it the
        circumstances under which it was made, which, in turn, can be argued to and
25      weighed by the jurors." (People v. Breckenridge, *supra*, 52 Cal.App.3d at p. 936;
        see People v. Rodrigues (1994) 8 Cal.4th 1060, 1155.) Further, there is no
26      "constitutional entitlement to ... particular methods of lessening the
        suggestiveness of in-court identification[s].... These are matters within the
27      discretion of the court. [Citation.]" (People v. Domina, *supra*, 784 F.2d at p.
        1369.) If [Petitioner] had been concerned about the witnesses seeing him sitting
28      alone at the defense table, he could have timely requested other seating
        arrangements, which the trial court probably would have granted. [Footnote

27

omitted] (See United States v. Matthews (2d Cir .1994) 20 F.3d 538, 547; United States v. Robertson (10th Cir.1994) 19 F.3d 1318, 1323.)

(*Id.* at 15.)

The California Court of Appeal held that petitioner had no constitutional right to reduce the suggestiveness of in-court identifications (*ibid.*).  Moreover, the state appellate court found petitioner's claim unconvincing because he argued to the jury about the weakness of in-court identification (*ibid.*).  Thus, the state court concluded that "[b]ecause the jury had all the necessary facts with which to weigh the reliability of the witnesses' in-court identification, the prosecutor's procedure in eliciting those identifications did not deprive [petitioner] of due process" (*ibid.*).

The Ninth Circuit has held that "[t]here is no constitutional entitlement to an in-court line-up or other particular methods of lessening the suggestiveness of in-court identification, such as seating the defendant elsewhere in the room. These are matters within the discretion of the court."  *United States v. Domina*, 784 F.2d 1361, 1369 (9th Cir. 1986).  However, "where the question of guilt or innocence hangs entirely on the reliability and accuracy of the in-court identification, the identification procedure should be as lacking in inherent suggestiveness as possible."  *Ibid.* (internal citations and quotations omitted).  Here, the prosecution had additional evidence besides the in-court identifications, including petitioner's own admissions and the lineup identifications (*see* CT at 434-451).  Consequently, the trial court did not have a duty to ensure the identification procedure was "as lacking in inherent suggestiveness as possible."  *Domina*, 784 F.2d at 1369.  Nevertheless, the trial court provided petitioner with the opportunity cross-examine the witnesses and argue to the jury about the unreliability of the in-court identifications in order to undermine their impact (Resp. Ex. C at 19).  Accordingly, the state court's finding that the in-court identifications did not violate due process was neither contrary to, nor an unreasonable application of, federal law.  *See* 28 U.S.C. 2254(d)(1).

### 23.    **Request for Funds to Hire Experts**

Petitioner contends that the trial court violated his right to due process by refusing to give him funds to hire an expert on identification by witnesses.  On direct appeal, the California Court of Appeal determined under state law that "*in a proper factual situation* a court must appoint an

expert that is needed to assist an indigent defendant in his defense" (Resp. Ex. C at 18 (internal

quotations removed and emphasis in original)).  However, the state appellate court rejected the

claim based on the following reasoning:

> In denying [Petitioner's] request, the trial court appropriately considered that there were no counts in the indictment that depended solely upon eyewitness identification, and that the testimony of the eyewitnesses could be adequately attacked by cross-examination. (Hurley, supra, 95 Cal.App.3d at p. 899; see People v. McDonald (1984) 37 Cal.3d 351, 363, overruled on other grounds in People v. Mendoza (2000) 23 Cal.4th 896, 914.) The prosecutor set forth the corroborating testimony she intended to offer at trial for each of the counts. At no time did the prosecutor acknowledge or [Petitioner] establish the People were relying solely upon eyewitness identification to support any count. Further, at the time of the motion, [Petitioner] did not give any reason why cross-examination of the witnesses would be inadequate in this case. [Petitioner] extensively cross-examined the witnesses regarding their ability to observe, describe and recall the incidents and the perpetrator, the uncertainty of their identifications, their failure to make earlier positive identifications, and their failure to include certain information in their previous statements to the police and testimony before the grand jury. During his closing argument, [Petitioner] repeatedly stressed the unreliability of the identifications, particularly noting that he was the only one at the defense table, some witnesses who were uncertain about identifying him before trial were able to identify him at trial, and although all of the witnesses to the same event had the same opportunity to see him, some of the witnesses were not able to identify him in court. The trial court instructions using CALJIC No. 2.91 and the factors in CALJIC No. 2.92, [Footnote omitted] which included consideration of cross-racial identifications, "'sufficiently focused the jury's attention on the People's burden of proof on the issue of identity,'" and "g[a]ve the jury a focal point for considering cross-examination and arguments as to the credibility and reliability of a given witness'[s] identification of [Petitioner]." (Hurley, supra, 95 Cal.App.3d at p. 901; see People v. Palmer (1984) 154 Cal.App.3d 79, 83.) [Petitioner] made no showing that in the absence of expert testimony the factors relevant to the jury's evaluation of the identification testimony listed in CALJIC 2.92 "might have [been] imperfectly understood or ... might have operated contrary to the jurors' intuitive beliefs." (Gaglione, supra, 26 Cal.App.4th at p. 1304; see People v. McDonald, supra, 37 Cal.3d at p. 363.) As conceded by [Petitioner], where a trial court has "explicitly found the requested services were not reasonably necessary, we w[ill] not now second-guess that determination; ... an appellant [sic] court will reverse such an order only when 'the circumstances shown compelled the [trial] court to exercise its discretion only in one way, namely, to grant the motion .' [Citation.]" (Corenevsky v. Superior Court (1984) 36 Cal.3d 307, 323.) On this record, we conclude the trial court could appropriately find "this was not 'a proper factual situation' requiring the appointment of an expert." (Hurley, supra, 95 Cal.App.3d at p. 900.) [Footnote omitted.]

(Resp. Ex. C at 18-20.)

Even if petitioner had a constitutional right to receive funds to hire an identification

expert, his claim fails because he cannot show a prejudicial effect.  A federal habeas court

reviewing the prejudicial effect of constitutional trial error does not simply examine whether

there was sufficient evidence to support the conviction in the absence of constitutional error. Rather, regardless of whether there is sufficient evidence to support the conviction apart from the error, the court must determine whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Only then is federal habeas relief warranted. *Penry v. Johnson*, 532 U.S. 782, 795-96 (2001).

Petitioner has not established that the lack of an identification expert resulted in a "substantial and injurious effect" on the verdict because, as explained by the California Court of Appeal: (1) the prosecution did not solely rely on eyewitness testimony; (2) the jury was instructed to consider the reliability of eyewitness testimony, including cross-racial identification; and (3) petitioner "extensively cross-examined the witnesses" regarding their ability to identify him (Resp. Ex. C at 18-19). Under these circumstances, any error in denying funding for such an expert did not cause sufficient prejudice to warrant habeas relief. Accordingly, petitioner's claim is denied.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.

The federal rules governing habeas cases brought by state prisoners have been amended to require a district court that denies a habeas petition to rule on a certificate of appealability ("COA") in the same order. *See* Rule 11(a), Rules Governing Section 2254 Cases, 28 U.S.C. 2254. For the reasons set out in the discussion above, petitioner has not shown "that jurists of reason would find it debatable whether the district court was correct" in denying his claims. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a COA is **DENIED**.

The clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated: November ___8___, 2011.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

G:\PRO-SE\WHA\HC.06\BROWN0264.RUL-final.wpd